# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| EMMANUEL JACKSON, | CASE NO. 1:19-CV-01865 |
| Plaintiff, | DISTRICT JAMES R. KNEPP, II |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| WARDEN BRANDESHAWN HARRIS, | |
| Defendant. | **REPORT & RECOMMENDATION** |

Petitioner Emmanuel Jackson brings this habeas corpus action pursuant to 28 U.S.C. § 2254.  (ECF Doc. 1.)  His federal habeas petition is deemed filed on August 3, 2019, the date he placed it in the prison mailing system.[1]  (ECF Doc. 1 p. 6 ("Petition").)  Mr. Jackson's Petition relates to his conviction of aggravated robbery, robbery, grand theft, theft, and kidnapping and sentence to an aggregate prison term of sixteen years in Cuyahoga County Common Pleas Court Case No. CR-16-608044-C, *State of Ohio v. Emmanuel Jackson* following a jury trial.  (ECF Doc. 1; ECF Doc. 7-1 pp. 18-19, 68.)   Respondent filed an Answer/Return of Writ (ECF Doc. 7), Petitioner filed a Traverse (ECF Doc. 19), and Respondent filed a Reply (ECF Doc. 20).

This matter was referred to the undersigned Magistrate Judge on February 15, 2022.  For the reasons set forth in further detail herein, the undersigned recommends that the Court **DENY** Mr. Jackson's Petition.

---

[1] "Under the mailbox rule, a habeas petition is deemed filed when the prisoner gives the petition to prison officials for filing in the federal courts." *Cook v. Stegall*, 295 F.3d 517, 521 (6th Cir. 2002) (citing *Houston v. Lack,* 487 U.S. 266, 273 (1988)).  Mr. Jackson's Petition was docketed in this Court on August 15, 2019.  (ECF Doc. 1.)

## I. Factual Background

"In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct."  28 U.S.C. § 2254(e)(1).  The petitioner has the burden of rebutting that presumption by clear and convincing evidence.  *Id.*; *Railey v. Webb*, 540 F.3d 393, 397 (6th Cir. 2008).

The Eighth District Ohio Court of Appeals summarized the facts underlying Mr. Jackson's conviction and sentence as follows:

> {¶ 2} Jackson and two codefendants, Anthony Palmentera and Bradley Lease, were indicted in an 11–count indictment with aggravated robbery, robbery, grand theft, theft, and kidnapping. Jackson and Lease were also indicted for having weapons while under disability. Some of the counts contained firearm, notice of prior conviction and repeat violent offender specifications.

> {¶ 3} The testimony at trial demonstrated that the indictments arose out of an incident that occurred outside the Peek–A–Boo nightclub in the early morning hours of July 13, 2016. The victim, Kenneth Mayock, drove a borrowed minivan to the club to pick up a friend who worked there. Mayock testified that three men approached the van as he waited in the parking lot of the club. Two of the men were white; the other was African American and later identified as Jackson.

> {¶ 4} Mayock said that the African American male approached the driver's side of the van, reached in, grabbed him by his hoodie, and demanded his money. Mayock said he gave the man his wallet, but the man pulled him out of the van, pushed him to the ground, and threatened to shoot him. Mayock testified that this man and the other men then hit him and again threatened to shoot him. The three men eventually drove off in the minivan, leaving Mayock on the ground. Mayock's iPhone was in the minivan.

> {¶ 5} Mayock ran into the nightclub and asked the bartender to call 911. Mayock then called his mother and asked her to track his cell phone on the Find My iPhone application on her phone. Cleveland police officers soon arrived at the nightclub and interviewed Mayock, who gave them a description of the minivan and the three men, including a description of a tattoo on the African American male's right arm, which Mayock had observed when the male reached through the van window and grabbed him.

2

{¶ 6} Cleveland police officer Courtney Evans was one of the officers who responded to the scene and interviewed Mayock. She testified that within 20 to 30 minutes after arriving, the officers learned the general location of the minivan and Mayock's cell phone from Mayock's mother, who was tracking the phone. The officers relayed this information to police officers in the area, who began touring the area looking for the van and the suspects.

{¶ 7} Within a short time, those officers found the van and three suspects, one of whom was Jackson, who matched the descriptions given by Mayock. The officers found Mayock's cell phone in the grass about ten feet away from where they apprehended Jackson. The police then transported Mayock to that location, and Mayock identified all three individuals in a "cold stand" identification as the individuals who had assaulted and robbed him earlier that night.

{¶ 8} Cleveland police officer Michael Keane testified at trial that he was one of the officers who found the abandoned van, as well as a pair of black and white sandals on the ground about five feet from the van. Keane testified that Jackson, who was not wearing any shoes or socks, denied knowing the two men arrested with him, but admitted that the sandals near the van were his.

{¶ 9} Cleveland police detective Jeffrey Grabski was assigned to investigate. During Det. Grabski's videotaped interview of Jackson, which was played for the jury, Jackson told Det. Grabski that he had been drinking at Henry's Bar in Cleveland that night, and later went to a friend's house on Oakley Avenue. Jackson denied knowing Palmentera and Lease, although Palmentera lived on Oakley Avenue and during his interview, Jackson referred to Lease as "John," which is Lease's middle name and the name he uses.

*State v. Jackson*, 2018-Ohio-1633, ¶¶ 2-9, 2018 WL 1968859, at *1-2 (Ohio App. Ct. Apr. 26, 2018); (ECF Doc. 7-1 pp. 68-70.)

## II. Procedural Background

### A.     State Court Conviction

In July 2016, a Cuyahoga County, Ohio grand jury indicted Mr. Jackson on the following nine counts: Count One – aggravated robbery in violation of R.C. § 2911.01(A)(1) with one- and three-year firearm specifications, notice of prior conviction, and repeat violent offender specification ("RVO"); Count Two – aggravated robbery in violation of R.C. § 2911.01(A)(3) with one- and three-year firearm specifications, notice of prior conviction, and RVO

specification; Count Three – robbery in violation of R.C. § 2911.02(A)(1) with one- and three-year firearm specifications, notice of prior conviction, and RVO specification; Count Four – robbery in violation of R.C. § 2911.02(A)(2) with one- and three-year firearm specifications, notice of prior conviction, and RVO specification; Count Five – robbery in violation of R.C. § 2911.02(A)(3) with one- and three-year firearm specifications; Count Six – grand theft in violation of R.C. § 2913.02(A)(1) with one- and three-year firearm specifications; Count Seven – theft in violation of R.C. § 2913.02(A)(1); Count Eight – kidnapping in violation of R.C. § 2905.01(A)(2) with one- and three-year firearm specifications, notice of prior conviction, and RVO specification; and Count Nine – having weapons under disability in violation of R.C. § 2923.13(A)(2).  (ECF Doc. 7-1 pp.  3-14.)   Mr. Jackson pleaded not guilty to the indictment on July 29, 2016.  (*Id*. at p. 15.)

The State offered Mr. Jackson and his two co-defendants (Palmentera and Lease) a package plea deal prior to the start of the jury trial on April 17, 2017.  (ECF Doc. 7-2 pp. 6-15.) Following the rejection of the plea deal by Mr. Jackson and his co-defendants, the trial court called the jury and started voir dire.  (*Id*. at pp. 6-15, 31-90.)  During the pendency of voir dire, Mr. Jackson's co-defendants appeared before the court with counsel to withdraw their pleas of not guilty and enter pleas of guilty to an amended indictment.  (*Id*. at pp. 91-112.)  The transcript does not reflect that Mr. Jackson or his counsel were present during the plea discussions.  (*Id*. at p. 92.)  As part their plea agreement, Palmentera and Lease "agree[d] not to come in and testify on behalf of Emmanuel Jackson during the pendency of his trial."  (*Id*. at p. 94.)

Following the changes of plea by Mr. Jackson's co-defendants, the trial court informed Mr. Jackson and his counsel that the co-defendants had "accepted some responsibility" and asked Mr. Jackson's counsel whether Mr. Jackson wanted to proceed.  (*Id*. at p. 112.)  At that point,

Mr. Jackson's counsel made an oral motion to continue the case and proceed with a different jury.  (*Id*. at pp. 112-15.)  The court granted the motion, dismissed the original jury panel, and started voir dire with a new jury panel.  (*Id*. at pp. 115-17.)

At the conclusion of the jury trial, Mr. Jackson was found guilty of: one first-degree felony aggravated robbery charge and the attached notice of prior conviction and RVO specifications; one second-degree felony robbery charge and the attached notice of prior conviction and RVO specifications; one third-degree felony robbery charge and the attached notice of prior conviction and RVO specifications; the fourth-degree felony grand theft charge, the first-degree misdemeanor theft charge, and the first-first-degree felony kidnapping charge and the attached notice of prior conviction and RVO specifications.  (ECF Doc. 7-1 pp. 16-17; ECF Doc. 7-2 pp. 912-22.)  The jury found Mr. Jackson not guilty of all other charges.  (*Id*.)

On May 23, 2017, Mr. Jackson appeared with counsel for his sentencing.  (ECF Doc. 7-1 pp. 18-19; ECF Doc. 7-2 pp. 926-40.)  The trial court found that Counts Two, Four, Five, Six, Seven, and Eight were allied offenses and the State elected to proceed with sentencing on Count Two – aggravated robbery, a first-degree felony with notice of prior conviction and RFC specification.  (ECF Doc. 7-1 p. 19; ECF 7-2 pp. 935-36.)  The trial court sentenced Mr. Jackson to eleven years in prison on Count Two and five years on the RVO specification to run consecutive to each other for an aggregate prison term of sixteen years.  (ECF Doc. 7-1 p. 19; ECF Doc. 7-2 p. 937.)  The trial court advised Mr. Jackson of his appeal rights and appointed appellate counsel.  (ECF Doc. 7-1 p. 19; ECF Doc. 7-2 p. 939.)  The court granted Mr. Jackson's motion for jail-time credit, awarding him three-hundred seventeen days of jail time credit.  (ECF Doc. 7-1 pp. 20-21.)

**B.** **Direct Appeal**

Mr. Jackson, through newly appointed appellate counsel, filed a notice of appeal in the Eighth District Court of Appeals on June 7, 2017. (ECF Doc. 7-1 pp. 22-33.) In his appellate brief filed on September 5, 2017, (ECF Doc. 7-1 pp. 34-58), Mr. Jackson raised the following assignment of error:

> The State of Ohio violated appellant's right to compuls[o]ry process under the United States Constitution and the State of Ohio Constitution by entering into [] plea agreements with appellant's codefendants (Anthony Palmentera and Bradley Lease) and setting forth as a condition of those plea agreements that the aforementioned codefendants agreed [] not to come in and testify on behalf of the appellant during the pendency of this trial.

(ECF Doc. 7-1 pp. 35, 47-57.) The State of Ohio filed its brief on October 30, 2017. (ECF Doc. 7-1 pp. 54-65.) The court of appeals affirmed the trial court's judgment on April 26, 2018. (ECF Doc. 7-1 pp. 66-80.)

On May 24, 2018, Mr. Jackson, acting *pro se*, filed a notice of appeal and memorandum in support of jurisdiction with the Supreme Court of Ohio. (ECF Doc. 7-1 pp. 81-82, 83-91.) In his memorandum in support of jurisdiction, Mr. Jackson raised the raised the following proposition of law:

> A criminal defendant has his constitutional right to due process violated when the prosecutor makes a plea agreement with the accused's codefendant(s) not to testify on the accused's behalf.

(*Id*. at pp. 84, 88.) On August 15, 2018, the Supreme Court of Ohio declined to accept jurisdiction of Mr. Jackson's appeal. (*Id*. at p. 92.)

**C.** **Motion for Leave to File Motion for New Trial**

On November 13, 2018, Mr. Jackson acting *pro se*, filed a motion for leave to file motion for new trial, (ECF Doc. 7-1 pp. 93-103), asserting that "[t]he basis for [his] motion for new trial [would] be a newly obtained affidavit from one of his co-defendants . . . Anthony D. Palmentera"

6

wherein Palmentera indicated he did not know Jackson and Jackson had nothing to do with the offense (*id*. at pp. 94-95, 97, 102-03).  The State of Ohio filed a brief in opposition on January 14, 2019.  (*Id*. at pp. 104-13.)  The trial court denied Mr. Jackson's motion for leave to file a motion for new trial on January 28, 2019, finding that Mr. Jackson: "failed to demonstrate on the face of his filings that he was unavoidably delayed from timely discovering [the] purported new evidence"; "failed to demonstrate that [it] [was] new evidence as defendant was aware of [the] facts during his trial and immediately there after took no steps to diligently inquire as to what evidence his codefendant would have offered"; and "[i]n fact jurors heard the evidence that defendant did not know Palmentera and was not part of the crime."  (*Id*. at p. 115.)

On February 22, 2019, Mr. Jackson, acting *pro se*, filed a notice of appeal in the Eighth District Court of Appeals from the trial court's January 28, 2019 denial of his motion for leave to file a motion for new trial.  (ECF Doc. 7-1 pp. 116-22.)  In his appellate brief, filed on April 16, 2019 (*id.* at pp. 123-38), Mr. Jackson raised the following assignments of error:

> 1.      The trial court erred in denying Appellant's Motion for Leave to File a Motion for New Trial, in violation of his Due Process protections under the Fourteenth Amendment to the U.S. Constitution and Article I, Section § 10 of the Ohio Constitution.

> 2.      The trial court erred in not holding a hearing on Appellant's Motion for Leave to File Motion for New Trial, in violation of his Due Process protections under the Fourteenth Amendment to the U.S. Constitution and Article I, Section § 10 of the Ohio Constitution.

(*Id*. at pp. 130-37.)  Shortly after the filing of Mr. Jackson's *pro se* appellate brief, on April 22, 2019, a notice of appearance by counsel was filed on behalf of Mr. Jackson.  (*Id*. at pp. 140-42.)  The State of Ohio filed its brief in response on May 29, 2019, (*id*. at pp. 143-57), and Mr. Jackson, through counsel, filed a reply brief on June 12, 2019 (*id.* at pp. 158-67.)  The case was scheduled for oral argument before the state court of appeals on November 12, 2019.  (*Id*. at p.

7

168.)  In his Traverse, Mr. Jackson provides additional procedural history regarding his state court proceedings, noting that the state court of appeals affirmed the trial court's decision on November 27, 2019.  (ECF Doc. 19 p. 1; *State v. Jackson*, 2019-Ohio-4893, ¶ 8, 2019 WL 6358465 (Ohio App. Ct. Nov. 27, 2019); *see also* (ECF Doc. 20 p. 6-10 (Respondent's Reply to Traverse)).)  On March 17, 2020, the Supreme Court of Ohio did not accept his appeal for review.  (ECF Doc. 19 p. 1; *State v. Jackson*, 2020-Ohio-877, 158 Ohio St. 3d 1436, 141 N.E.3d 254 (2020).)

At the time of filing his Traverse in June 2020, Mr. Jackson reported that an Ohio App.R. 26(A) application for reconsideration of the appellate court's decision was pending in the state court of appeals.  (ECF Doc. 19 pp. 1-2.)  He does not contend that the Ohio App.R. 26(A) application or any related decisions bear on the Petition pending before this Court.

**D.     Federal Habeas Corpus Petition**

Mr. Jackson raises one ground for relief in this Petition:

> **GROUND ONE**:   Petitioner's right to Due Process under the Fifth and Fourteenth Amendments to the U.S. Constitution was violated when the prosecutor entered into a plea agreement with Petitioner's co-defendants which stipulated that the co-defendants would not testify on the behalf of Petitioner.

> **Supporting Facts**:   In the present case, Petitioner was indicted along with co-defendants Anthony Palmentera and Bradley Lease.  All three individuals initially pleaded not guilty.  Just prior to the onset of trial, and without the knowledge of Petitioner and his defense counsel, Palmentera entered into a plea agreement with the prosecutor.   "The plea agreements were identical to those set forth by the prosecutor immediately before trial but contained two additionals provisions: (1) the defendants agreed to have no contact with the victim, and (2) as the prosecutor told the judge, '[Palmentera and Lease] also agree not to come in and testify on behalf of Emmanual Jackson during the pendency of his trial.'" State v. Jackson, 2018-Ohio-1633 at ¶ 14.

(ECF Doc. 1 p. 4.)

8

## III. Law & Analysis

### A.      Standard of Review Under AEDPA

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996, PL 104–132, April 24, 1996, 110 Stat 1214, 110 Stat. 1214 ("AEDPA"), apply to petitions filed after the effective date of the AEDPA. *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007). "As amended by AEDPA, 28 U.S.C. § 2254 sets several limits on the power of a federal court to grant an application for a writ of habeas corpus on behalf of a state prisoner." *Cullen v. Pinholster*, 563 U.S. 170, 181, 131 S. Ct. 1388, 1398, 179 L. Ed. 2d 557 (2011). Under 28 U.S.C. § 2254, federal courts may "entertain only those applications alleging that a person is in state custody 'in violation of the Constitution or laws or treaties of the United States'" and in most instances, federal courts may not grant habeas relief "unless . . . the applicant has exhausted state remedies." *Id.* (citing 28 U.S.C. §§ 2254(a), (b), (c)). Further, if an application for writ of habeas corpus involves a claim that was "adjudicated on the merits in State court proceedings," the application "shall not be granted unless the adjudication of the claim"

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2); *Cullen*, 563 U.S. at 181; *Harrington v. Richter*, 562 U.S. 86, 100, 131 S. Ct. 770, 785, 178 L. Ed. 2d 624 (2011); *Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007). The burden of proof rests with the petitioner. *Cullen*, 563 U.S. at 181.

Under § 2254(d)(1), "[a] decision is 'contrary to' clearly established federal law when 'the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or decides a case differently than the Supreme Court has on a set of materially

indistinguishable facts.'" *Otte v. Houk*, 654 F.3d 594, 599 (6th Cir. 2011) (quoting *Williams v. Taylor*, 529 U.S. 362, 412–13, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000)). As explained by the Supreme Court, "circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court,' 28 U.S.C. § 2254(d)(1)" and "therefore cannot form the basis for habeas relief under AEDPA." *Parker v. Matthews*, 567 U.S. 37, 48–49, 132 S. Ct. 2148, 2155, 183 L. Ed. 2d 32 (2012). "A state court's adjudication only results in an 'unreasonable application' of clearly established federal law when 'the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'" *Id*. at 599-600 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous." *Lockyer v. Andrade*, 538 U.S. 63, 75, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). "The state court's application of clearly established law must be objectively unreasonable." *Id.*

Under § 2254(d)(2), "[a] state court decision involves 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding' only if it is shown that the state court's presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not have support in the record." *Matthews*, 486 F.3d at 889 (citing 28 U.S.C. § 2254(d) and § 2254(e)(1)). "The presumption of correctness also applies to factual findings made by a state appellate court based on the trial record." *Matthews*, 486 F.3d at 889 (citing *Sumner v. Mata,* 449 U.S. 539, 546-47, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981)).

The Supreme Court has explained that under AEDPA "a state prisoner seeking a writ of habeas corpus from a federal court 'must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Bobby*

*v. Dixon*, 565 U.S. 23, 24, 132 S. Ct. 26, 27, 181 L. Ed. 2d 328 (2011) (quoting *Harrington v.*

*Richter*, 562 U.S. 86,  103, 131 S. Ct. 770, 786–87, 178 L. Ed. 2d 624 (2011)).  "[E]ven a strong

case for relief does not mean the state court's contrary conclusion was unreasonable."

*Harrington*, 562 U.S. at 102.  The "standard is difficult to meet" and "was meant to be" because

"habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,'

not a substitute for ordinary error correction through appeal."  *Id.* at 102-03 (quoting *Jackson v.*

*Virginia*, 443 U.S. 307, 332 n.5, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979) (Stevens, J., concurring

in judgment)).  In short, "[a] state court's determination that a claim lacks merit precludes federal

habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's

decision."  *Id*. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664, 124 S. Ct. 2140, 158

L. Ed. 2d 938 (2004)).

**B.**     **Sole Ground for Relief**

In his sole ground for relief, Mr. Jackson argues that he was denied his right to due

process under the Fifth Amendment and compulsory process under the Sixth Amendment when

the prosecutor entered plea agreements with his co-defendants that precluded them from

testifying on his behalf.  (ECF Doc. 1 p. 4; *see also* ECF Doc. 19 p. 3.)  While the respondent

agrees that the claim was properly exhausted in state court, he asserts that habeas relief is not

warranted because the state court of appeals' adjudication of the claim did not result in a decision

that was contrary to, or involved an unreasonable application of, clearly established Federal law

as determined by the Supreme Court of the United States.  (ECF Doc. 7; ECF Doc. 20.)  The

undersigned agrees that the Mr. Jackson presented and exhausted his compulsory process claim

to the state courts, and therefore addresses his claim more fully below.

11

### 1. Constitutional Right to Compulsory Process and Due Process

"[T]he right of a defendant in a criminal case under the Sixth Amendment to have compulsory process for obtaining witnesses in his favor is applicable to the States through the Fourteenth Amendment." *Washington v. Texas*, 388 U.S. 14, 14, 87 S. Ct. 1920, 1921, 18 L. Ed. 2d 1019 (1967). The Supreme Court in *Washington* explained:

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

*Id.* at 19. The court then evaluated whether a petitioner's right to compulsory process was violated where he was barred from presenting the testimony of a coparticipant who "would have testified that petitioner pulled at him and tried to persuade him to leave, and that petitioner ran before [the coparticipant] fired the fatal shot." *Id.* at 16, 19. After finding it was "undisputed that [the coparticipant's] testimony would have been relevant and material, and that it was vital to the defense," the *Washington* court held that:

> [T]he petitioner in this case was denied his right to have compulsory process for obtaining witnesses in his favor because the State arbitrarily denied him the right to put on the stand a witness who was physically and mentally capable of testifying to events that he had personally observed, and whose testimony would have been relevant and material to the defense.

*Id.* at 16, 23.

Fifteen years later, the Supreme Court considered whether a defendant's rights to compulsory process under the Sixth Amendment and due process under the Fifth Amendment were violated when the government deported two illegal aliens who were apprehended with the defendant. *United States v. Valenzuela-Bernal*, 458 U.S. 858, 102 S. Ct. 3440, 73 L. Ed. 2d 1193

12

(1982).  The defendant in *Valenzuela-Bernal* was indicted for transporting an illegal alien named Romero-Morales, and sought to dismiss the indictment because "the Government's deportation of the two passengers other than Romero-Morales violated his Fifth Amendment right to due process of law and his Sixth Amendment right to compulsory process for obtaining favorable witnesses." *Id.* at 861.  He argued "the deportation had deprived him of the opportunity to interview the two remaining passengers to determine whether they could aid in his defense." *Id.*

The Supreme Court in *Valenzuela-Bernal* observed that "[t]he only recent decision of this Court dealing with the right to compulsory process guaranteed by the Sixth Amendment suggests that more than the mere absence of testimony is necessary to establish a violation of the right." 458 U.S. at 867 (citing *Washington*, 388 U.S. 14).  It explained that "the Sixth Amendment does not by its terms grant to a criminal defendant the right to secure the attendance and testimony of any and all witnesses: it guarantees him 'compulsory process for obtaining *witnesses in his favor.*'" *Id.* (quoting U.S.Const., Amdt. 6) (emphasis in original).  Noting that the constitutional violation in *Washington* involved testimony the court found "'would have been *relevant* and *material*, and … *vital* to the defense,'" the *Valenzuela-Bernal* court concluded that the defendant could not "establish a violation of his constitutional right to compulsory process merely by showing that deportation of the passengers deprived him of their testimony." *Id.* (quoting *Washington*, 388 U.S. at 16) (emphasis in original); *see also United States v. Freeman*, 173 F.3d 857, *2 (6th Cir. 1999).

Beyond a mere absence of testimony, the Supreme Court found a defendant "must at least make some plausible showing of how [the] testimony would have been both material and favorable to his defense." *Valenzuela-Bernal*, 458 U.S. at 867.  The court recognized that "a defendant who has not had an opportunity to interview a witness may face a difficult task in

13

making a showing of materiality," but nevertheless observed that "the task is not an impossible one." *Id.* at 871.  It went on to explain:

> In such circumstances it is of course not possible to make any avowal of *how* a witness may testify.  But the events to which a witness might testify, and the relevance of those events to the crime charged, may well demonstrate either the presence or absence of the required materiality.

*Id.* (emphasis in original).

Turning to the Fifth Amendment due process argument, the Supreme Court stated: "Having borrowed much of our reasoning with respect to the Compulsory Process Clause of the Sixth Amendment from cases involving the Due Process Clause of the Fifth Amendment, we have little difficulty holding that at least the same materiality requirement obtains with respect to a due process claim."  458 U.S. at 872.

*Valenzuela-Bernal* thus makes it clear that a violation of the "Compulsory Process Clause of the Sixth Amendment or the Due Process Clause of the Fifth Amendment" can only be established through a "showing that the evidence lost would be both material and favorable to the defense." *Id*. at 873.  The defendant's obligation to make some showing of materiality was not relieved when the prompt deportation of the two witnesses deprived him "of an opportunity to interview the witnesses to determine precisely what favorable evidence they possess[ed]."  *Id.* While he could not "be expected to render a detailed description of their lost testimony," he was at least required "to make some showing of materiality."  *Id.*  Since the defendant "made no effort to explain what material, favorable evidence the deported passengers would have provided for his defense," the Supreme Court found that he failed to establish a violation of the Fifth or Sixth Amendment.  *Id.* at 874.

14

### 2. Harmless Error Determination Under AEDPA

"In *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 828, 17 L. Ed. 2d 705 (1967), [the Supreme Court] held that the standard for determining whether a conviction must be set aside because of federal constitutional error is whether the error 'was harmless beyond a reasonable doubt.'" *Brecht v. Abrahamson*, 507 U.S. 619, 622, 113 S. Ct. 1710, 1713, 123 L. Ed. 2d 353 (1993).  In its later decision in *Brecht*, the Supreme Court addressed whether the *Chapman* harmless-error standard, which applied on direct review, also applied in the context of collateral review federal habeas proceedings.  *Brecht*, 507 U.S. at 630–31, 635–66.  The court concluded that the *Chapman* "standard was inappropriate for use in federal habeas review of final state-court judgments."  *Brown v. Davenport*, 142 S. Ct. 1510, 1523 (2022) (citing *Brecht*, 507 U.S. at 633-34).  "Instead, the [*Brecht*] Court reasoned, a state prisoner should not receive federal 'habeas relief based on trial error unless' he can show the error had a 'substantial and injurious effect or influence' on the verdict."  *Id.*

Three years after *Brecht* was decided, Congress enacted AEDPA, which established that a federal court may only grant habeas relief if "certain conditions are satisfied."  *Brown*, 142 S. Ct. at 1524 (internal citations omitted).  While this enactment created some initial uncertainty as to what standards applied on federal collateral review of a state prisoner's conviction, the Supreme Court recently tackled that uncertainty by addressing the following questions:

> After a state court determines that an error at trial did not prejudice a criminal defendant, may a federal court grant habeas relief based solely on its independent assessment of the error's prejudicial effect under *Brecht v. Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)? Or must a federal court also evaluate the state court's decision under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)?

*Id.* at 1517.  In answer, the court held: "When a state court has ruled on the merits of a state prisoner's claim, a federal court cannot grant relief without first applying <u>both</u> the test this Court

15

outlined in *Brecht* [*v. Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)] and the one Congress prescribed in AEDPA." *Id.* (emphasis added).  Thus, the Supreme Court found "satisfying *Brecht* is only a necessary, not a sufficient, condition to relief," because "AEDPA too must be satisfied." *Id.* at 1520.

The Supreme Court supported this decision by explaining that the inquiry under the two standards is distinct.  For example, "when a state court has applied *Chapman*, § 2254(d)(1) requires a habeas petitioner to prove that the state court's decision was unreasonable." *Brown*, 142 S. Ct. at 1525.  To meet this burden, "a petitioner must persuade a federal court that no 'fairminded juris[t]' could reach the state court's conclusion under this Court's precedents." *Id.* (quoting *Davis v. Ayala*, 576 U.S. 257, 269, 135 S. Ct. 2187, 192 L. Ed. 2d 323 (2015)).  "By contrast, under *Brecht* a petitioner may prevail by persuading a federal court that it alone should harbor 'grave doubt'—not absolute certainty—about whether the trial error affected the verdict's outcome." *Id.*  Thus, while "AEDPA asks whether *every* fairminded jurist would agree that an error was prejudicial, *Brecht* asks only whether a federal habeas court *itself* harbors grave doubt about the petitioner's verdict." *Id.* (emphasis in original).

Also, the court observed that the legal materials available for consultation by the court differ under *Brecht* and AEDPA.  *See Brown*, 142 S. Ct. at 1525.  Under AEDPA, relief is available only where the state court rendered a decision that was contrary to or an unreasonable application of "clearly established Federal law, as determined by the Supreme Court of the United States," not "lower court federal precedents." *Id.*  Additionally, under AEDPA, the reasonableness of a state court decision is viewed in light of Supreme Court precedent at the time the state court issued its decision, "and cannot be held unreasonable only in light of later decided cases." *Id.*  These restrictions are not applicable under *Brecht*.  *Id.*  Accordingly, the Supreme

16

Court observed that "a petitioner might be able to prevail under *Brecht* thanks to favorable circuit case law but still lose under AEDPA because no comparable holding exists in [the Supreme] Court's precedents."  *Id.*

Thus, even if a petitioner "*can* satisfy *Brecht*," that does not "necessarily secure[] [him] a victory under AEDPA."  *Brown*, 142 S. Ct. at 1528 (emphasis in original).  Under the standards enunciated in *Brown*, "a federal court must *deny* relief to a state habeas petitioner who fails to satisfy either this Court's equitable precedents <u>or</u> AEDPA," but "must find that the petitioner has cleared <u>both</u> tests" in order "to *grant* relief."  *Id.* at 1524 (italics in original; underlining added). Considering these principles, the Supreme Court found that the Sixth Circuit erred in *Brown* because "[it] granted relief after finding for [the petitioner] on *Brecht*," but "disregarded Congress's instruction that habeas relief 'shall not be granted' unless AEDPA's terms are satisfied. § 2254(d)."  *Id.*

### 3.  State Court Adjudication of Mr. Jackson's Compulsory Process Claim

Mr. Jackson's claim "that the state violated his constitutionally protected right to compulsory process by entering into plea agreements with Palmentera and Lease that barred them from testifying as witnesses for the defense at his trial" was adjudicated on the merits by the state court of appeals.  *Jackson*, 2018 WL 1968859, at *2; (ECF Doc. 7-1 pp. 72-73 at ¶¶ 15-16.)  The court found as follows:

> {¶ 17} The Sixth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution preserve to an accused the right to present witnesses in his defense and to compel their attendance at trial. *State v. McIntosh*, 1st Dist. Hamilton No. C–020593, 2003–Ohio–3824, ¶ 17, citing *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). "The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies." *Washington* at *id.* "Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging

17

their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law." *Id.*

{¶ 18} Accordingly, "governmental impairment of the accused's ability to call witnesses on his behalf cannot be tolerated." *United States v. Bell*, 506 F.2d 207, 222 (D.C. Cir.1974). Thus, in *Washington*, the United States Supreme Court held that a state procedural statute that precluded persons charged as principals, accomplices, or accessories in the same crime from testifying as witnesses for each other denied the defendant his Sixth Amendment right to compulsory process for obtaining witnesses in his favor because the statute operated to exclude the relevant and material testimony of a co-conspirator.

{¶ 19} Similarly, in *State v. Henricksen*, 564 F.2d 197 (5th Cir.1997), the court reversed the defendant's conviction and remanded for a new trial where a codefendant refused to testify for the defense after entering into a plea agreement with the state in which he agreed not to testify for the defendant, and the government stated the agreement would be void if he so testified. The principle underlying these and similar cases is that "the refusal of a defense witness to testify must be voluntary, and the state may not prevent a witness from testifying for the defendant." *State v. Fort*, 101 N.J. 123, 130, 501 A.2d 140 (1985).

{¶ 20} In this case, there is no question the state improperly precluded Lease and Palmentera from testifying on Jackson's behalf at his trial by prohibiting such testimony as a condition of their plea agreements. The trial court likewise improperly precluded Lease and Palmentera's testimony by accepting pleas that included such a condition.

{¶ 21} However, to establish a violation of the right to compulsory process, even where the government's actions have precluded a witness from testifying, a defendant must make some plausible showing of how the witness's testimony would have been both material and favorable to his defense. *United States v. Valenzuela–Bernal*, 458 U.S. 858, 873, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982); *State v. Brown*, 8th Dist. Cuyahoga No. 86544, 2006–Ohio–2573, ¶ 104. The omitted testimony "must be evaluated in the context of the entire record," and the Sixth Amendment is not implicated if, upon consideration of the omitted testimony, there remains no reasonable doubt about guilt. *Brown* at ¶ 104.

{¶ 22} Jackson does not specify to what Palmentera and Lease would have testified, but contends that the state's action in obtaining plea agreements with them that precluded them from testifying for the defense demonstrates a "reasonable probability" that their testimony would have been helpful to his defense. He also contends that, in any event, he was precluded from learning how Palmentera and Lease would have testified because they were motivated against providing him with any assistance to avoid the possibility their plea deals would be rescinded.

{¶ 23} But more than "the mere absence of testimony" is necessary to establish a violation of the right to compulsory process. *Valenzuela–Bernal*, 458 U.S. at 867. And the fact that the defendant cannot interview the witnesses does not relieve the defendant of his burden to demonstrate materiality. *Id.* at 870, 873. In determining whether the omitted testimony would have been material and favorable to the accused, "courts should afford some leeway for the fact that the defendant necessarily proffers a description of the material evidence rather than the evidence itself." *Id.* at 874. Additionally, the defendant cannot be expected to render a detailed description of the lost testimony. *Id.* But even where the defendant has not had an opportunity to interview witnesses, the materiality requirement is not dispensed with completely. *Id.* As the United States Supreme Court stated in *Valenzuela–Bernal*:

> [W]hile a defendant who has not had an opportunity to interview a witness may face a difficult task in making a showing of materiality, the task is not an impossible one. In such circumstances it is of course not possible to make any avowal of how a witness may testify. But the events to which a witness might testify, and the relevance of those events to the crime charges, may well demonstrate either the presence or absence of the required materiality.

*Id.* at 871.

{¶ 24} In this case, Jackson does not explain what material, favorable evidence Palmentera and Lease would have provided for his defense. At least a "plausible theory" of how the testimony of the missing witnesses would be helpful to the defense must be offered, however. *Valenzuela–Bernal*, 458 U.S. at 867, 102 S.Ct. 3440, 73 L.Ed.2d 1193.

{¶ 25} Jackson's reliance on *McIntosh*, 1st Dist. Hamilton No. C–020593, 2003–Ohio–3824, to overturn his conviction is misplaced. In *McIntosh*, the appellate court remanded for an evidentiary hearing on the defendant's postconviction petition, in which he alleged that the state had denied him his right to compulsory process by entering into plea agreements with coindictees that precluded them from testifying for the defense, and that his attorney was ineffective for not subpoenaing the coindictees to testify at trial. The court noted that McIntosh had not supported his petition with the substance of the coindictees' likely testimony to demonstrate how their testimony would have been material and favorable to the defense, *id.* at ¶ 20, but found that this failure was because the right to compel their testimony was denied McIntosh at trial and in the initial stages of the postconviction proceeding. *Id.* at ¶ 21. The court concluded that the "problems of proof" demanded a thorough examination of the claims at an evidentiary hearing. *Id.*

19

{¶ 26} *McIntosh* is distinguishable from this case. In *McIntosh*, the defendant moved to sever his trial from his coindictees, arguing that their testimony was "crucial" to his defense. *Id.* at ¶ 12. The trial court denied the motion when the prosecutor assured the court that all of the coindictees would be available to testify, despite their guilty pleas. *Id.* Later, the defendant moved for a mistrial, arguing that the state had committed prosecutorial misconduct by making plea agreements with his coindictees that precluded their testimony for the defense. *Id.* at ¶ 14. The prosecutor initially denied that the plea agreements precluded testimony favorable to the defense. Then, when confronted with a letter from counsel to the prosecutor outlining the terms of the plea agreement with one of the coindictees, the prosecutor denied that the provision precluding defense testimony was at the state's suggestion, and assured the court that the witnesses could be subpoenaed and brought before the court. *Id.* at ¶ 15. The trial court denied the motion for a mistrial based upon the prosecutor's assurances that the coindictees were available to testify. *Id.* But a letter subsequently submitted with the defendant's postconviction petition demonstrated that despite the prosecutor's denials, the prosecutor was actively involved in procuring plea agreements that prevented the coindictees from testifying for the defense. *Id.* at ¶ 16. In light of these events, the court determined that the trial court had erred in denying the defendant's postconviction petition without a "thorough examination" of the claims at an evidentiary hearing. *Id.* at ¶ 21.

{¶ 27} The type of egregious conduct set forth in *McIntosh* did not occur in this case. And unlike *McIntosh*, Jackson did not raise the compulsory process issue in the trial court or seek to obtain his codefendants' testimony. Likewise, on appeal, he does not set forth any theory regarding how their testimony would have been material and favorable to his defense. Accordingly, he has failed to meet his burden of demonstrating a Sixth Amendment violation.

{¶ 28} Moreover, after evaluating the entire record, we are satisfied that, despite the state's improper conduct in suppressing Lease and Palmentera's testimony, the evidence presented at trial overwhelmingly established Jackson's participation in the events of July 13, 2016. Jackson and his codefendants were apprehended only a short time after the robbery based on descriptions provided by Mayock. During the cold stand identification, Mayock identified Jackson as one of the three men who had assaulted and robbed him. At trial, Mayock identified the tattoo on Jackson's right arm, which Jackson showed to the jury, as the same tattoo Mayock observed when the African American male reached through the van window and grabbed him. Mayock's iPhone, which was in the minivan when the three males drove away, was recovered on the ground about ten feet away from where Jackson was apprehended, and Jackson's sandals were found only a few feet away from the van. And although Jackson denied knowing Palmentera and Lease, during his interview with Det. Grabski, Jackson referred to Lease as "John," the name by which Lease is known. In light of this evidence, there is no reasonable doubt about Jackson's guilt. Palmentera and Lease's testimony would not have changed the outcome of the trial. *See Brown*, 8th Dist. Cuyahoga No.

86544, 2006–Ohio–2573, ¶ 104 (Sixth Amendment not implicated if there remains no reasonable doubt about guilt).

*Jackson*, 2018 WL 1968859, at *3-5; (ECF Doc. 7-1 pp. 73-79 at ¶¶ 17-28.)

### 4.   Whether Mr. Jackson's Petition Meets the AEDPA Standard

The record reflects that the state court of appeals properly cited to and relied upon the Supreme Court precedent in *Valenzuela-Bernal* when assessing Mr. Jackson's compulsory process claim.  In particular, the appeals court indicated Mr. Jackson failed to present "[a]t least a 'plausible theory' of how the testimony of the missing witnesses would be helpful to the defense," as required under *Valenzuela–Bernal*, when he "d[id] not explain what material, favorable evidence Palmentera and Lease would have provided for his defense."  *Jackson*, 2018 WL 1968859, at *4 ¶ 24 (quoting 458 U.S. at 867).  This is consistent with the Supreme Court's finding in *Valenzuela–Bernal* that the respondent had "failed to establish a violation of the Fifth or Sixth Amendment" when he "made no effort to explain what material, favorable evidence the deported passengers would have provided for his defense."  458 U.S. at 874.  In fact, Mr. Jackson concedes that "the state appellate court was correct that in his direct appeal no 'plausible theory' was offered as to what 'material, favorable evidence' would have been provided by either Palmentera or Lease."  (ECF Doc. 19 p. 5.)  Nevertheless, he contends habeas relief remains appropriate based on several legal theories, which are addressed below.

### i.   "Presumption of Prejudice" Standard

First, Mr. Jackson argues based on *Doggett v. United States*, 505 U.S. 647, 112 S. Ct. 2686, 120 L. Ed. 2d 520 (1992) that "a presumption of prejudice … overcomes" his failure to offer a plausible theory as to what material, favorable evidence the two witnesses would have provided under *Valenzuela–Bernal*.  (ECF Doc. 19 p. 5.)  In *Doggett*, the Supreme Court held that "a delay of 8 ½ years between [a] petitioner's indictment and arrest violated his Sixth

Amendment right to a speedy trial."  505 U.S. at 648.  In that context, the court held "affirmative proof of particularized prejudice is not essential to every speedy trial claim," noting that the "impairment of one's defense is the most difficult form of speedy trial prejudice to prove because time's erosion of exculpatory evidence and testimony 'can rarely be shown.'"  *Id.* at 655 (citations omitted).  On that basis, the court recognized that "excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify," such that "presumptive prejudice" should be among the matters considered in a Sixth Amendment speedy trial analysis.  *Id.* at 655-56.  The presumptive prejudice standard in *Doggett* is clearly inapplicable here, where the Petition does not assert a speedy trial claim.

Mr. Jackson also argues that a presumption of prejudice is appropriate in light of the Supreme Court's finding in *United States v. Cronic*, 466 U.S. 648, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984), that circumstances may warrant a "presumption of prejudice" in an ineffective assistance of counsel claim where those circumstances make "the likelihood that any lawyer, even a fully competent one, could provide effective assistance … so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial."  (ECF Doc. 19 p. 10 (quoting *Cronic*, 466 U.S. 648).)  He argues that this presumption was continued by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), where the court held that "[a]ctual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice."  (*Id.* (quoting *Strickland*, 466 U.S. 668).)  Like the standard in *Doggett*, the presumptive prejudice standards in *Cronic* and *Strickland* are inapplicable here, where the Petition does not assert an ineffective assistance of counsel claim.

Mr. Jackson argues that the presumed prejudice standard articulated in *Cronic* and *Strickland* is applicable here because his trial "counsel was rendered ineffective due to the

improper preclusion perpetrated by the State of Ohio, and permitted by the trial court."  (ECF Doc. 19 p. 10.)   To the extent Mr. Jackson is attempting to assert an additional claim for relief based on ineffective assistance of counsel, that argument is not properly before this Court because he did not raise it in his Petition.  *See Tyler v. Mitchell*, 416 F.3d 500, 504 (6th Cir. 2005) (finding claim first presented in petitioner's traverse rather than in his petition were not properly before the district court and it was not error for the court to decline to address it).

 Mr. Jackson also cites to the Supreme Court decision in *Davis v. Alaska*, 415 U.S. 308, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974).  (ECF Doc. 19 p. 11.)  In *Davis*, the court granted certiorari to consider whether the confrontation clause required that a criminal defendant be allowed to impeach a prosecution witness regarding his status as a juvenile delinquent, despite the state's interest in preserving the confidentiality of juvenile delinquency adjudications.  *See* 415 U.S. at 309.  The court concluded that "the right of confrontation is paramount to the State's policy of protecting a juvenile offender," so that the state's desire to allow the juvenile offender to "testify free from embarrassment and with his reputation unblemished must fall before the right of [the] petitioner to seek out the truth in the process of defending himself."  *Id.* at 319-20. Drawing an analogy to this holding, Mr. Jackson argued:

> Similarly, here the fact that the State of Ohio found it necessary to preclude Palmentera and Lease from being able to testify on behalf of Jackson creates a very strong presumption that their testimonies would have caused serious damage to the prosecution's case against Jackson.  What other reason could there have been for the prosecution to include such a nefarious stipulation in Palmentera's and Lease's plea agreements?

(ECF Doc. 19 p. 11.)  The analogy is not sound.  Not only is this citation another example of Supreme Court precedent governing a constitutional violation Mr. Jackson did not assert in his Petition, the court in *Davis* was not addressing a situation where prejudice was presumed without knowing the substance of the excluded testimony.  While Mr. Jackson seeks a presumption of

23

prejudice based on the mere fact that the government sought to exclude the relevant witness testimony, the court in *Davis* knew exactly what testimony was excluded by the court's protective order and considered the potential impact that hearing that testimony might have had on the jury.  *See Davis*, 415 U.S. at 310-14, 317-18.

For the reasons stated, the undersigned finds Mr. Jackson's "presumptive prejudice" arguments, which are based entirely on Supreme Court authority regarding constitutional violations that were not alleged in the Petition, to be unpersuasive and inapplicable in this case.

### ii. Arguments Based on Circuit and State Court Precedent

Next, despite acknowledging the Supreme Court's holdings in *Washington* and *Valenzula-Bernal*, Mr. Jackson argues based on findings in a "pair of Sixth Circuit decisions" and an Oklahoma appellate court decision that "no showing of materiality or prejudice should be necessary" to show that precluding Mr. Jackson's co-defendants from testifying on his behalf "deprived him of his constitutional right to compulsory process."  (ECF Doc. 19 pp. 6-9 (citing *United States v. Emuegbunam*, 268 F.3d 377 (6th Cir. 2001), *United States v. Young*, 146 F. App'x 824 (6th Cir. 2005), and *Summers v. State*, 2010 OK CR 5).)  He specifically quotes the Sixth Circuit in *Emuegbunam* for the proposition that "[p]rosecutorial actions 'aimed at discouraging defense witnesses from testifying deprive a defendant of this [constitutional] right.'"  (ECF Doc. 19 p. 8 (quoting 268 F.3d at 400).)

Because these arguments rely on asserted distinctions between Supreme Court precedent and individual circuit and state court decisions, they must fail.  It is well-established that "circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court,'" as required under 28 U.S.C. § 2254(d)(1).  *Parker*, 567 U.S. at 48–49.  The same finding extends to the Oklahoma state court decision.  Thus, any standards in the cited Sixth

Circuit and Oklahoma cases that are distinct from the established Supreme Court precedent "cannot form the basis for habeas relief under AEDPA." *Id.*

Here, Mr. Jackson conceded that the state appellate court was correct in finding that he offered "no plausible theory" as to what "material, favorable evidence" the witnesses would have offered at trial plausible theory" as to what "material, favorable evidence" the witnesses would have offered at trial.  (*See* ECF Doc. 19 p. 5.)  He also acknowledged that the Supreme Court in *Valenzuela-Bernal* required just such a showing.  (*See id.* at p. 8.)  Under AEDPA, relief is available only where the state court decision was contrary to, or an unreasonable application of, "clearly established Federal law, as determined by the Supreme Court of the United States," not "lower court federal precedents."  *Brown*, 142 S. Ct. at 1525; *see also id.* ("[F]or example, a petitioner might be able to prevail under *Brecht* thanks to favorable circuit case law but still lose under AEDPA because no comparable holding exists in this Court's precedents.").  Since there is no dispute that the state appellate court properly applied the Supreme Court standard in *Valenzuela-Bernal* in denying relief, Mr. Jackson's argument for the application of a more permissive standard here based on Circuit and state court decisions must fail.

It is also observed that the Sixth Circuit's findings in *Emuegbunam* and *Young* do not support a contrary finding.  While both courts generally recognized that prosecutorial actions "aimed at discouraging defense witnesses from testifying" may deprive defendants of the Sixth Amendment right to compulsory process, both courts also found the relevant petitioner failed to demonstrate government conduct that amounted to "substantial interference" with the right to call witnesses in his defense.  *Emuegbunam,* 268 F.3d at 400; *Young*, 146 Fed.Appx at 830-31.  In both cases, the petitioners had explicitly sought to interview or call the relevant witness to testify, but the witnesses exercised their Fifth Amendment rights against self-incrimination.

*Emuegbunam,* 268 F.3d at 399; *Young,* 146 Fed.Appx at 830. Here, in contrast, Mr. Jackson did

not seek to interview or call his co-defendants as witnesses. *See Jackson*, 2018 WL 1968859, at

*4, ¶ 27. The *Emuegbunam* court also noted that "a harmless error analysis" would apply even if

substantial interference were demonstrated. 268 F.3d at 400. None of these findings undermine

or are contrary to the Supreme Court's holding in *Valenzuela-Bernal* that petitioners seeking to

demonstrate a confrontation clause violation must first provide at least a "plausible theory" as to

what "material, favorable evidence" the witnesses would have offered at trial. 458 U.S. at 867.

For all of the reasons stated above, Mr. Jackson's arguments based on distinctions

between circuit and state court decisions and the Supreme Court's holding in *Valenzuela-Bernal*

are found to be unpersuasive and without merit.

### iii.    Additional Legal Arguments

In addition to his Sixth Amendment arguments, Mr. Jackson argues that his Fifth

Amendment due process rights were violated under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct.

1194, 10 L. Ed. 215 (1963) and *Arizona v. Youngblood*, 488 U.S. 51, 109 S. Ct. 333, 102 L. Ed.

281 (1988) because "[t]he stipulation created by the State of Ohio, and authorized by the trial

court, which precluded Palmentera and Lease from testifying on Jackson's behalf, served to

suppress evidence that (as reasoned above) not only must be presumed to have been favorable to

Jackson, but the affidavit of Palmentera removes all doubt would have been favorable to

Jackson." (ECF Doc. 19 p. 12.) This argument must fail for the reasons outlined below.

Consistent with Mr. Jackson's arguments, the Supreme Court's decisions in *Brady* and

*Arizona* did address "what might loosely be called the area of constitutionally guaranteed access

to evidence." *Arizona*, 488 U.S. at 55 (citing *Valenzuela-Bernal*, 458 U.S. at 867). (ECF Doc.

19 p. 12 (citing and quoting same).) And in those cases, as Mr. Jackson points out, the Supreme

Court did hold that "'the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'"  *Arizona*, 488 U.S. at 55 (quoting *Brady*, 373 U.S. at 87).  (ECF Doc. 19 p. 12 (citing and quoting same).)  Indeed, the decision in *Brady* was one of the primary sources for the "materiality requirement" for compulsory process claims that was outlined by the Supreme Court in *Valenzuela-Bernal*.  *See* 458 U.S. at 867-88.

However, contrary to Mr. Jackson's arguments, this precedent does not support the proposed finding that the co-defendant testimony precluded by the plea agreements in this case "must be presumed to have been favorable to Jackson."  (ECF Doc. 19 p. 12.)  Instead, based explicitly on the materiality requirements set forth in *Brady* and *Arizona*, the Supreme Court in *Valenzuela-Bernal* held that no Sixth Amendment violation could be established "without making some plausible explanation of the assistance [the defendant] would have received from the testimony of the deported witnesses," and further that "at least the same materiality requirement obtains with respect to a due process claim."  458 U.S. at 871-72.  Mr. Jackson concedes that "the state appellate court was correct that in his direct appeal no 'plausible theory' was offered as to what 'material, favorable evidence' would have been provided" by the testimony of either co-defendant.  (ECF Doc. 19 p. 5.)  None of the findings in *Brady* or *Arizona* are inconsistent with a finding that the state court correctly applied the governing Supreme Court standard in *Valenzuela-Bernal* in this case.

Since the state court of appeals adjudicated Mr. Jackson's claim on the merits, even if he could demonstrate trial court error, he would be required to persuade this Court under *Brecht* that "it alone should harbor 'grave doubt'. . . about whether the trial error affected the verdict's outcome" <u>and</u> show under AEDPA "that no 'fairminded jurist' could reach the state court's

27

conclusion under [the Supreme] Court's precedents." *Brown*, 142 S. Ct. at 1525. Mr. Jackson

has not met either burden. He made no attempt in his direct appeal to "at least make some

plausible showing of how their testimony would have been both material and favorable to his

defense." *Valenzuela-Bernal*, 458 U.S. at 867. He also did not seek to interview or call

Palmentera or Lease as witnesses, even though he denied knowing them at the time of trial.

(ECF Doc. 7-1 p. 70 ¶ 8.)

      While Mr. Jackson notes that he has more recently provided the affidavit of Palmentera

"which surely would have seriously damaged the State of Ohio's case against Jackson," (ECF

Doc. 19 p. 12 n. 5), a federal habeas court's review "is limited to the record that was before the

state court that adjudicated the claim on the merits" when assessing whether the state court's

adjudication "'resulted in' a decision that was contrary to, or 'involved' an unreasonable

application of, established law." *Cullen*, 563 U.S. at 181 (discussing § 2245(d)(1)). The state

court of appeals did not have the Palmentera affidavit when it adjudicated Mr. Jackson's

compulsory process claim. Thus, it would not be appropriate for this Court to consider that

affidavit in assessing whether the state court of appeals' decision was unreasonable or contrary to

clearly established law.

      It is additionally noted that Mr. Jackson has not raised an independent claim relating to

the denial of his motion for new trial. Thus, it would not be appropriate for this Court to

consider the Palmentera affidavit in the context of reviewing the state court's adjudication of his

motion for new trial. Moreover, the Sixth Circuit has explained that "the writ [of habeas corpus]

is not the proper means by which prisoners should challenge errors or deficiencies in state post-

conviction proceedings . . . because the claims address collateral matters and not the underlying

state conviction giving rise to the prisoner's incarceration." *Kirby v. Dutton*, 794 F.2d 245, 247

(6th Cir. 1986). Thus, even if Mr. Jackson had submitted a claim in these proceedings based on the denial of his motion for new trial, such a claim would be "outside the scope of federal habeas corpus review." *Cress v. Palmer*, 484 F.3d 844, 853 (6th Cir. 2007) (citing *Kirby*, 794 F.2d at 246–47; *Roe v. Baker*, 316 F.3d 557, 571 (6th Cir. 2002)).

As the Supreme Court has explained, under AEDPA "a state prisoner seeking a writ of habeas corpus from a federal court 'must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Bobby*, 565 U.S. at 24 (internal citation omitted). Considering the foregoing, the undersigned finds that Mr. Jackson has not met his burden and is not entitled to federal habeas relief.

## IV. Recommendation

For the reasons stated above, the undersigned recommends that the Court **DENY** Mr. Jackson's Petition.

Dated: June 23, 2022

/s/ Amanda M. Knapp
AMANDA M. KNAPP
UNITED STATES MAGISTRATE JUDGE

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).